AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. 20-sw-85 |
| 18 DIGITAL DEVICES, CURRENTLY LOCATED AT THE | ) | |
| WASHINGTON OFFICE OF THE DRUG ENFORCEMENT | ) | |
| ADMINISTRATION, 801 I STREET NW, WASHINGTON, D C | ) | |
| UNDER RULE 41 | | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Affidavit and Attachment A, incorporated herein.

located in the _____ District of ____ Columbia ____, there is now concealed *(identify the person or describe the property to be seized)*:

See Affidavit and Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 846, 843(b), 959(a) and 963, and 856 | Possession with intent to distribute and distribution of controlled substances, conspiracy to possess with intent to distribute and distribute controlled substances, use of communication facilities to facilitate those offenses, conspiracy to distribute and possess with intent to distribute controlled substances knowing/intending that such substances would be unlawfully imported into the U S . using/maintaining place for purpose of manufacturing, storing, and distributing controlled substances |

The application is based on these facts:

See attached affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent William M. Johnston
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: ____ 03/16/2020 ____

_____
*Judge's signature*

City and state:  Washington, D.C.

Robin M. Meriweather, United States Magistrate Judge
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

### for the

### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  20-sw-85 |
| 18 DIGITAL DEVICES, CURRENTLY LOCATED AT THE | ) | |
| WASHINGTON OFFICE OF THE DRUG ENFORCEMENT | ) | |
| ADMINISTRATION, 801 I STREET NW, WASHINGTON, D C | ) | |
| UNDER RULE 41 | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Columbia _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

**YOU ARE COMMANDED** to execute this warrant on or before _____ March 30, 2020 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Robin M. Meriweather _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   3/16/2020 _____          _____
                                                                    *Judge's signature*

City and state:   Washington, D.C. _____          Robin M. Meriweather, United States Magistrate Judge
                                                                    *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>20-sw-85 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| Certification |
|---|
| I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge. |

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

1.     The pieces of property to be searched are cellular telephones and computers, hereinafter the "DEVICES", and are further described as follows:

| | |
|---|---|
| (a) | Alcatel Cell phone; IMEI 015026003929237 |
| (b) | Samsung Flip Phone; MEID hex A0000048D17EF6 |
| (c) | ZTE Cell Phone - AT&T |
| (d) | Samsung Galaxy S8; FCCID: A3LSMG892A |
| (e) | Samsung Cell Phone; IMEI 354727082440710 |
| (f) | Samsung Cell Phone; IMEI 354727088783162 |
| (g) | LG Cell Phone; IMEI 354233083248640 |
| (h) | LG Cell Phone; IMEI 354892-07-357362-0 |
| (i) | LG Cell Phone; IMEI 013341-00-080267-1 |
| (j) | LG Cell Phone; IMEI DEC 270113183812318462 |
| (k) | LG Cell Phone; IMEI DEC 270113183811641651 |
| (l) | Alcatel Cell phone; IMEI 015163006402043 |
| (m) | Alcatel Cell phone; IMEI 015114003019652 |
| (n) | LG Cell Phone; IMEI 014651-00-426573-6 |
| (o) | LG Cell Phone; IMEI 354233081390642 |
| (p) | LG Cell Phone; IMEI 358385081376918 |
| (q) | Alcatel Cell phone; IMEI 015371001446432 |
| (r) | HP laptop computer; Serial #: 5CD4472RTL |

2.     The DEVICES are currently located at in the non-drug evidence vault at the Washington Office of the Drug Enforcement Administration, 801 I Street NW, Washington, DC 20001. This warrant authorizes the forensic examination of the DEVICES for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.      All records on the DEVICES described in Attachment A that relate to violations of possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); conspiracy to possess with intent to distribute and distribute controlled substances, in violation of 21 U.S.C. § 846; conspiracy to distribute, and possess with intent to distribute, controlled substances, knowing and intending that such substances would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a) and 963; use of communication facilities to facilitate the commission of the above offenses involving controlled substances, in violation of 21 U.S.C. § 843(b); and using and maintaining a place for the purpose of manufacturing, storing, and distributing controlled substances in violation of 21 U.S.C. § 856, and involve Toriano JOHNSON, including:

   a.  the nature, scope, extent and methods of operation of the crack cocaine trafficking activities in which the target subjects and others as yet unknown or not yet fully identified are engaged;

   b.  the methods of operation of the target subjects including, but not limited to, the means and manner by which individuals are obtaining and redistributing large quantities of crack cocaine in Virginia;

   c.  the identities, roles, and telephone numbers of co-conspirators, accomplices, aiders and abettors, and other participants in such illegal activity;

   d.  the source of money and controlled substances;

   e.  the existence and location of apartments, residences, businesses and other premises used in the furtherance of the illegal activity;

   f.  the methods of operation for transferring proceeds of illegal drug sales;

g. the existence and location of records of the illegal activity;

h. the existence, location, and source of resources used to finance the illegal activity;

i. the existence and location of any other items or means used in furtherance of those activities; and

j. the dates, times, and details of the continued commission of the above-mentioned offenses;

2.  Evidence of user attribution showing who used or owned the DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.  As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF 18 DIGITAL DEVICES, CURRENTLY LOCATED AT THE WASHINGTON OFFICE OF THE DRUG ENFORCEMENT ADMINISTRATION, 801 I STREET NW, WASHINGTON, D.C. UNDER RULE 41 | SW No. 20-85 |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, William M. Johnston, Special Agent of the Drug Enforcement Administration (DEA), being duly sworn, depose and state the following:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— seventeen cellular telephones and one laptop computer—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.     I have been a Special Agent with the DEA since July 2009. I am currently assigned to the Washington Division Office, located in Washington, DC. I am responsible for criminal investigations including, but not limited to, gangs and drug trafficking organizations. During my employment in law enforcement, I have conducted and assisted in numerous investigations of narcotics traffickers. I have received training and experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, surveillance,

undercover (UC) operations, operations involving confidential sources (CS), and a variety of other investigative tools available to law enforcement officers. Through my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics and the organization of drug conspiracies. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing CSs; conducting physical surveillance; conducting short-term undercover operations; consensual monitoring and recording of telephonic communications; analyzing telephone pen register and caller identification data; conducting court-authorized electronic surveillance; and executing search warrants which have led to substantial seizures of narcotics, firearms, currency, and other contraband.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based upon my training and experience and the facts set forth in this affidavit, there is probable cause to believe that the Devices described in Attachment A contain electronically stored information, as described in Attachment B, will yield evidence of the commission of the offenses of possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); conspiracy to possess with intent to distribute and distribute of controlled substances, in violation of 21 U.S.C. § 846; use of communication facilities to facilitate the commission of the above offenses involving controlled substances, in violation of 21 U.S.C. § 843(b); conspiracy to distribute, and possess with intent to distribute,

2

controlled substances knowing and intending that such substances would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a) and 963; and using and maintaining a place for the purpose of manufacturing, storing, and distributing controlled substances in violation of 21 U.S.C. § 856.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

5.    The DEVICES to be searched are the following

- Alcatel Cell phone; IMEI 015026003929237

- Samsung Flip Phone; MEID hex A0000048D17EF6

- ZTE Cell Phone - AT&T

- Samsung Galaxy S8; FCCID: A3LSMG892A

- Samsung Cell Phone; IMEI 354727082440710

- Samsung Cell Phone; IMEI 354727088783162

- LG Cell Phone; IMEI 354233083248640

- LG Cell Phone; IMEI 354892-07-357362-0

- LG Cell Phone; IMEI 013341-00-080267-1

- LG Cell Phone; IMEI DEC 270113183812318462

- LG Cell Phone; IMEI DEC 270113183811641651

- Alcatel Cell phone; IMEI 015163006402043

- Alcatel Cell phone; IMEI 015114003019652

- LG Cell Phone; IMEI 014651-00-426573-6

- LG Cell Phone; IMEI 354233081390642

- LG Cell Phone; IMEI 358385081376918

- Alcatel Cell phone; IMEI 015371001446432

- HP laptop computer; Serial #: 5CD4472RTL

6.      The DEVICES are currently located in the non-drug evidence vault at the Washington Office of the Drug Enforcement Administration, 801 I Street NW, Washington, DC 20001.

## PROBABLE CAUSE

7.      The DEA and Orange County Sheriff's Office ("OCSO") have been conducting an investigation to address the drug trafficking in Orange County, Virginia, and Spotsylvania County, Virginia. Agents have found that Toriano A. JOHNSON, Bennie D. COOK, Yace M. LEWIS, Henry L. JOHNSON MINOR, Irvin W. JOHNSON Jr., and Irvin W. JOHNSON Sr. are drug traffickers in a Drug Trafficking Organization ("DTO"). The T. JOHNSON DTO distributes crack cocaine and other drugs in Orange County, Virginia, and Spotsylvania County, Virginia, as well as adjacent areas.

8.      During multiple interviews, CSs and other SOIs have told law enforcement officers that T. JOHNSON is the head of a DTO. The DTO includes Henry L. JOHNSON MINOR, Yace M. LEWIS, Irvin W. JOHNSON Jr., Irvin W. JOHNSON Sr., Bennie D. COOK, and others. These CSs and SOIs have said that the DTO sells narcotics, primarily crack cocaine. Each CS used to make controlled purchases from the DTO made such purchases without incident. The CSs and SOIs gave information that corroborated one another as to the members of the DTO and their roles in the organization.

4

9.      These CSs and SOIs have said that H. MINOR, Y. LEWIS, I. JOHNSON Sr., and I. JOHNSON Jr. sold out of 3151 Flat Run Road, Locust Grove, VA, and 3144 Flat Run Road, Locust Grove, VA. Sources indicate that most of the crack they sold was supplied by T. JOHNSON. Sources indicate that the crack was often stored at 3160 Flat Run Road, Locust Grove, VA.

10.     Since August of 2018, agents have used multiple confidential sources to make drug purchases from H. MINOR, Y LEWIS, I. JOHNSON Sr., and I. JOHNSON Jr. inside and in front of 3151 Flat Run Road and 3144 Flat Run Road. During some of these purchases, law enforcement officers have evidence that the drugs were obtained from 3160 Flat Run Road. The most recent purchase was in October 2019.

11.     During many of these controlled purchases, the CSs called and/or texted with the seller to set up their purchases.

12.     During the course of the investigation, multiple CSs and SOIs had different cellular telephone numbers for Toriano JOHNSON. Many of them said that T. JOHNSON had a personal cellular telephone and a separate drug cellular telephone (a phone specifically used to coordinate drug trafficking). They said that T. JOHNSON changed his drug telephone number every few months.

13.     On November 21, 2019, law enforcement officers executed federal search warrants at T. JOHNSON's residence at 11136 Sunburst Lane, Apt G, Fredericksburg, VA; B. COOK's residence at 3160 Flat Run Road, Locust Grove, VA; I. JOHNSON Sr's residence at 3151 Flat Run Road, Locust Grove, VA; and H. MINOR's residence at 3144 Flat Run Road, Locust Grove, VA. During these searches, officers seized suspected marijuana from all locations

except 3144 Flat Run Road. Officers seized over an ounce of suspected crack cocaine from the trunk of an unregistered 1997 Mercedes Benz on the property of 3160 Flat Run Road. This vehicle was previously registered to Toriano JOHNSON. Officers seized three firearms from 3151 Flat Run Road and one firearm from the property of 3160 Flat Run Road. Officers also seized the electronic devices described in Attachment A (the DEVICES): 2 from 3160 Flat Run Road; 3 from 3151 Flat Run Road; and 13 from 11136 Sunburst Lane.

      14.    At 3151 Flat Run Road, Locust Grove, VA, officers seized:

- Alcatel Cell phone; IMEI 015026003929237 from the living room;
- Samsung Flip Phone; MEID hex A0000048D17EF6 from the bedroom on the bed; and
- ZTE Cell Phone - AT&T from the bedroom.

Irvin JOHNSON Sr. and Yace LEWIS were present at this house during the search. Both were arrested. No one else was in the house, and no one else was known to live there.

      15.    At 3160 Flat Run Road, Locust Grove, VA, officers seized:

- Samsung Galaxy S8; FCCID: A3LSMG892A from the person of Bennie COOK; and
- HP laptop computer; Serial #: 5CD4472RTL from the trunk of an unregistered 1997 Mercedes Benz on the property. The vehicle was previously registered to Toriano JOHNSON. Crack cocaine, mentioned above in paragraph 15, was also found in the trunk of this vehicle.

6

Bennie COOK was arrested in the house on this property. Peggy Robinson (Bennie COOK's mother) also lived in this house, but she was not arrested.

16.    At 11136 Sunburst Lane, Apt G, Fredericksburg, VA, in the master bedroom, officers seized:

- Samsung Cell Phone; IMEI 354727082440710;

- Samsung Cell Phone; IMEI 354727088783162;

- LG Cell Phone; IMEI 354233083248640;

- LG Cell Phone; IMEI 354892-07-357362-0;

- LG Cell Phone; IMEI 013341-00-080267-1;

- LG Cell Phone; IMEI DEC 270113183812318462;

- LG Cell Phone; IMEI DEC 270113183811641651;

- Alcatel Cell phone; IMEI 015163006402043;

- Alcatel Cell phone; IMEI 015114003019652;

- LG Cell Phone; IMEI 014651-00-426573-6;

- LG Cell Phone; IMEI 354233081390642;

- LG Cell Phone; IMEI 358385081376918;

- Alcatel Cell phone; IMEI 015371001446432.

Two adults (Toriano JOHNSON and Megan KIRKPATRICK) and two children (Dmariah KIRKPATRICK and Tlaya JOHNSON) were present during the search. Most of the phones seized at this location were together in one drawer in the master bedroom. Officers left one phone with Toriano JOHNSON (after extracting the data from it with Toriano JOHNSON's

consent) and officers left Megan KIRKPATRICK with the phone she indicated was hers. Toriano JOHNSON saw all the phones that officers were seizing and did not indicate that any of them belonged to anyone but him. Toriano JOHNSON was later arrested (on 12-13-2019) for his involvement in the crack cocaine conspiracy. Toriano JOHNSON was interviewed on 11-21-2019 during the execution of the search warrant at 11136 Sunburst Lane. During that interview, Toriano JOHNSON was looking in his phone for the address of a cocaine supplier. He couldn't find it in his phone and indicated it was likely in one of the other phones that officers were seizing.

17.     Based on the foregoing, it is believed the DEVICES seized were used to facilitate narcotics transactions and other activities of the DTO.

### USE OF TELEPHONES AND COMPUTERS BY NARCOTICS TRAFFICKERS

18.     Through training and participation in investigations, I have become familiar with the manner and methods by which narcotics traffickers conduct their illegal business and the slang, code or idioms used by those individuals to disguise conversations about their narcotics activities, especially when they are communicating by telephone, by text messaging, or via the Internet. Through training and experience I know that:

a.     Groups that traffic in narcotics are made up of individuals who operate in an organized fashion;

b.     Narcotics traffickers frequently use cellular telephones to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular location at which they might be subject to

physical surveillance by law enforcement authorities, because they believe that interception of cellular communications is more difficult;

c. Narcotics traffickers frequently use multiples phones and multiple phone numbers to evade detection by law enforcement. They will frequently use different phone to talk to different people for this purpose; and

d. Narcotics traffickers frequently use cell phone applications to communicate in order to conceal their communications from law enforcement.

19. Based on my training and experience, I know that people who commit crime often use their cell phones and computers in ways that reveal their location and/or activities before, after, or while engaging in criminal activity. For example, this may include location information (*e.g.*, GPS data), app usage information (*e.g.*, Internet search inquiries), and images or video recordings relevant to the criminal activity. Furthermore, I know from training and experience that call logs, text messages, emails, and any app enabling communication with others often include communications that shed light on the user's location and activity during a particular time period.

20. Based on my training and experience, I know that people who possess illegal drugs, unlawfully obtained money, and other contraband often use their cell phones to capture and store images or video recordings of such contraband – sometimes called "trophy photos." They also often share these images or video recordings with associates using email, text messaging, or other forms of communication on their cell phone such as online social networking services. Similarly, they often refer to their illegal drugs, and other contraband in text messages, emails, or other written communications that are carried out by and stored on their cell

phone. These communications, images, and video recordings can be evidence of a perpetrator's prior possession of contraband, and of his or her knowledge and intent relating to such possession.

21.     Based on my training and experience, I know that crimes carried out by more than one person often involve some amount of communication among those involved. This may involve working out details of and preparing to carry out a premeditated crime, or simply arranging to meet up someplace where an unplanned crime would later occur. Either way, I know from training and experience that cell phones are often used for this purpose and that a cell phone recovered from a participant in such criminal activity often contains evidence of communication among accomplices.

22.     Based on my training and experience, I know that cell phones and computers generally contains information which can indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, electronic communications, lists of contacts and calendar entries, social media account information, and images or video recordings – plus data associated with the foregoing, such as date and time – may indicate who used or controlled the device at particular times. From training and experience, I also know that a cell phone often contains images, video recordings, and audio recordings of the cell-phone user and his close associates. These may reveal or confirm distinguishing characteristics – such as voice, tattoos, clothing, vehicle, and hangouts – that may help identify them.

23.     Based on my training and experience, I know that victims, witnesses, and perpetrators of crime often communicate between and among themselves before, during, and

after the crime. They communicate using text messaging, apps, social media, photographs, audio and/or video recordings, etc. In my training and experience, such communications have revealed the identities and relationships between and among the involved individuals, as well as their motive, hostility, knowledge, and intent relating to the crime. Moreover, such communications have also revealed consciousness of guilt and efforts to impede police investigation.

24. Based on my training and experience, I know that individuals involved in criminal activity often use their cell phones and computers to search the internet or social media sites to learn the status of a criminal investigation, i.e. look up the newspaper articles about the crime, determine if the police have suspects, and learn the identity of witnesses.

25. Furthermore, based on my training and experience, I know that witnesses, and even perpetrators, often record criminal activity. For example, witnesses have recorded school fights, attacks on public transportation, and police shootings and assaults. These videos have proven extremely crucial in investigations by depicting the crime itself.

26. The forensic examination of the DEVICES would reasonably be expected to yield evidence concerning:

a. the nature, scope, extent and methods of operation of the crack cocaine trafficking activities in which the target subjects and others as yet unknown or not yet fully identified are engaged;

b. the methods of operation of the target subjects including, but not limited to, the means and manner by which individuals are obtaining and redistributing large quantities of crack cocaine in Virginia;

c. the identities, roles, and telephone numbers of co-conspirators, accomplices,

aiders and abettors, and other participants in such illegal activity;

      d.     the source of money and controlled substances;

      e.     the existence and location of apartments, residences, businesses and other premises used in the furtherance of the illegal activity;

      f.     the methods of operation for transferring proceeds of illegal drug sales;

      g.     the existence and location of records of the illegal activity;

      h.     the existence, location, and source of resources used to finance the illegal activity;

      i.     the existence and location of any other items or means used in furtherance of those activities; and

      j.     the dates, times, and details of the continued commission of the above-mentioned offenses.

## TECHNICAL TERMS

27.    Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

      a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

      1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with

such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling

13

communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

   c. A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

   d. A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites

orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

        e.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

        f.     "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

        g.     Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer

15

attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

        h.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

        i.     "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.    "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.    "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

i.   When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

ii.   Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

o.      "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and

19

other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

28. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.apple.com, https://www.samsung.com, and https://www.lg.com, I know that many of the DEVICES have capabilities that allow them to perform many of the functions of a computer, typically having a touchscreen interface, internet access, and operating systems capable of running downloaded applications. Further, they can send and receive text messages, serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and personal digital assistants (PDA).

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

29. As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the DEVICES, in whatever form they are found. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the DEVICES for at least the following reasons:

a. Individuals who engage in criminal activity—including the possession with intent to distribute and distribution of controlled substances, conspiracy to possess with intent to distribute and distribute of controlled substances, and the other drug-related offenses described above—use digital devices, like the DEVICES to access websites to facilitate illegal activity, to

20

communicate with co-conspirators online, to store documents and records relating to their illegal activity, to maintain contact information of co-conspirators, to keep an accounting of illegal proceeds, and other, related purposes.

b.  Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.  Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently

viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

30.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital devices were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the DEVICES at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the DEVICES, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted

22

from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b. Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c. A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

23

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.   I know that when an individual uses a digital device to take steps like communicate to further a criminal offense, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of

24

Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

31.    Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.   Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled

environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.  Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.  Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves

26

to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

      e.  Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most

smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

 f. Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

 32. In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

 a. The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.  The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.  In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the Device(s) will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

33.  Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

29

## CONCLUSION

34.    I submit that this affidavit supports probable cause for a warrant to search the

DEVICES described in Attachment A and to seize the items described in Attachment B.


Respectfully submitted,

William M. Johnston
Special Agent
Drug Enforcement Administration


Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on March 16, 2020.


UNITED STATES MAGISTRATE JUDGE
ROBIN M. MERIWEATHER